Louis B. Heller, J.
This is the melancholy chronicle of the naval officer’s widow and the cad. The fact that the navy was that of the Austro-Hungarian Empire, and that the cad is now a prosperous medical practitioner, is only incidental. Although he is hardly deserving of the compassion he himself never mani *834 fested, I have captioned this opinion ‘ ‘ Boe v. Doe ’ ’ to save this pillar of the medical and residential community the embarrassment of having his identity revealed.
In 1934 the lady, at that time an attractive 29-year-old widow, first met the man with whom she was to have the ill-fated romance that proved to be her undoing. For the reason stated above, she shall be referred to as Jane Doe, and he shall be Bichard Boe. Bichard, an American, was then a medical student at the University of Vienna and interning at the Vienna General Hospital, where Jane was a patient being treated for an attack of influenza.
Jane owned her own home in Vienna and lived in respectable circumstances in a style befitting her status as the widow of a captain in the former Imperial Navy. She befriended Bichard, took him into her home, and from early 1934 until October, 1936, when Bichard received his medical degree, lived with him as husband and wife, albeit without benefit of clergy. Bichard, of course, as an impecunious student, bore none of the expenses.
Upon graduating from the University of Vienna, Dr. Bichard Boe returned to the United States, promising to write to Jane, and if conditions in the United States were salutary, he would send money for her passage so that she could join him here. Dr. Boe subsequently wrote to her, stating that he wanted to marry her, and for her to sell her household furnishing and belongings so that they could establish a home in America. True to form, and which for the next 10 years was to be a pattern, Dr. Boe was interning at a hospital in New York and could send her no money. Jane sold all her earthly possessions and paid her own passage.
Jane boarded a ship at Antwerp and arrived at Hoboken on the 21st of October, 1937, being met at the pier by Dr. Boe. She came into this country with approximately $2,000, the residue of the moneys she had received for her furniture, etc. and was ensconced by Dr. Boe in a New York hotel for about a week. Thereafter, to show Bichard that she was willing to co-operate with him during his internship, Jane took a job as a sleep-in maid at a New York lady’s home where she earned $40 per month, and. where she was regularly visited by Dr. Boe. Jane not only entrusted her $2,000 to his safekeeping, but the still impecunious intern graciously accepted the $40 per month Jane earned, since Dr. Boe had convinced her that she had no need for the money as she was getting free room and meals from her employer.
On March 18, 1938 Dr. Boe married Jane. They took an apartment in Manhattan and Jane assumed the obligation of making payments for furniture costing $300. It should be noted *835 that during all this time Dr. Roe never introduced Jane to his parents. After the marriage, without the knowledge of her husband, Jane went to Dr. Roe’s parents and introduced herself as their son’s wife.
Then came the deluge.
It seems that Dr. Roe’s parents were religious people and their son had committed what to them was the cardinal sin. He had married outside his faith. The scenes, outbursts, confrontations, recriminations and turbulence that resulted from this traumatic revelation can only be imagined. Apparently the dutiful son, characterized by Jane in one of her subsequent affidavits asa“ craven, spineless jellyfish,” could not withstand the onslaughts of his outraged parents. He abandoned Jane, to sleep in his father’s house.
The denouement came on June 2, 1938 when Jane was served with papers wherein Dr. Roe sued for an annulment alleging that Jane had fraudulently induced him to marry her. At about the same time deportation proceedings were instituted against her on the ground that she had overstayed the time permitted under her visitor’s visa. It should be noted that deportation to her native land, which by that time had been taken over by Hitler, would have subjected Jane to penal sanctions for having married a Jew. I will make the observation without further comment that the institution of deportation proceedings against Jane at the time of her difficulties with her husband was exceptionally coincidental.
The annulment action came on to be heard in the Supreme Court, Kings County. The Justice presiding dismissed the complaint, holding that the allegations of Dr. Roe were fantastic, absurd and not to be believed.
Thereafter Jane brought a separation action against Dr. Roe on the grounds of desertion, abusive treatment and nonsupport. She was awarded temporary alimony in the sum of $5 per week. The herculean efforts of Dr. Roe to resist payment of even this paltry sum awarded to Jane are demonstrated by his numerous poormouth affidavits, some written in ink in his own hand, ostensibly because he could not afford the services of an attorney.
As late as May 28, 1941, he was making motions for reargument, swearing: ‘ ‘ While I understand that the only interest of the court in this proceeding is whether I have any funds wherewith to support the plaintiff, there is no evidence before this court and there never has been any evidence before the court tending to show that I have any funds, salary, or other resources from which I could support the plaintiff.”
*836 This from a man who six years before had received his degree as a doctor of medicine. Of course he produced a letter from a hospital stating that Dr. Roe was still an intern and received no remuneration for his services.
I have carefully examined the voluminous papers in three different files in these actions and the records are barren of any indication that perennial student, Dr. Roe, ever paid a nickel for his wife’s support.
He was also generous with attorneys. One of his wife’s attorneys brought suit against Dr. Roe in 1939 for nonpayment of -a court-awarded $100 counsel fee, alleging that Dr. Roe owned two parcels of real estate which he had vehemently denied owning. The Justice presiding referred the matter to an Official Referee. The Official Referee reported, after a hearing in which Dr. Roe was represented by counsel, that Dr. Roe “ in defraud of his creditors, resulting from his marital status, did, on and after the date of marriage to Jane Doe, transfer and convey the aforesaid properties to his mother and father; that the attorney for Jane Doe in this action is a creditor of Dr. Roe; that the properties located at.........................Street, Brooklyn, New York and....................Street, Brooklyn, New York are subject to a claim for reasonable counsel fee by the attorney for Jane Doe.”
In all fairness to Dr. Roe, it must be pointed out that the Official Referee’s report also found that the properties had originally been transferred to Richard by his father in defraud of Ms creditors. The apple does not fall far from the tree.
To quote from another Dr. Roe affidavit, this one dated September 28, 1940: “ On the other hand I married the plaintiff and recognize my obligations. I am willing to support her when I will be able to do so. I can state with some certainty to your honor that within two years I will be earning some money and should be able to support the plaintiff.” The gallant Dr. Roe then continued with his affidavit: “ At the present time I move that no alimony or counsel fees be ordered since I have no money and since the plaintiff is earning $40.00 monthly besides getting room and food.”
In the midst of all these trials and tribulations, abandoned and alone, her dreams of a second chance at happiness rudely shattered, the spectre of deportation to Nazi Germany hanging over her head, Jane Doe suffered a mental breakdown. I will make no judgment as to whether Jane’s breakdown was caused by her tragic situation, or whether it was only precipitated by it. Suffice it to say that on June 6, 1941 she was committed to Kings Park State Hospital as being an insane person.
*837 After Jane had been confined to Kings Park for five years, Dr. Roe brought another annulment action against Jane, this time on the ground of incurable insanity for a period of five years, which resulted in a judgment of annulment being granted to Dr. Roe on October 20, 1946. He married another woman two weeks later.
At the annulment hearing Dr. Roe swore that his only income was $65 per month, which he was receiving as a student at Bellevue Hospital. This after having been a medical doctor for 10 years!
During the five years that Jane had been institutionalized Dr. Roe contributed nothing toward her care or maintenance in the hospital, nor did he send her as much as 10 cents to provide her with the wherewithal to purchase a bar of candy or other luxury.
By the terms of the judgment of annulment Dr. Roe was directed to pay the sum of $20 per month toward the care and maintenance of Jane. Dr. Roe made these payments until Jane was deported to Vienna, Austria on February 28, 1950. When Jane was deported Dr. Roe stopped the $20 payments.
Jane Doe is now a 67-year-old woman. For the past 31 years she has languished in mental institutions. During lucid intervals she has need for pocket money. She earns approximately $2 per month for this purpose by doing menial work in the laundry of the Psychiatric Hospital in Vienna.
The instant motion is made by the attorney for the Consul General of Austria in the City of New York, attorney in fact of the defendant Jane Doe, residing in Austria, by the guardian of her person, pursuant to an appointment by the District Court at Ybbs, Austria.
The motion seeks an order for sundry relief including retroactive modification of the order contained in the judgment of annulment for the care and maintenance of defendant Jane Doe, who has been a patient at the Psychiatric Hospital of the City of Vienna since March 14, 1950; in the alternative, pursuant to section 244 of the Domestic Relations Law, directing that defendant have a money judgment in the sum of $5,160 representing unpaid care and maintenance due, pursuant to the judgment of annulment, from March 1,1950 through August 31,1971, together with interest as accrue4; pursuant to section 236 of the Domestic Relations Law and the fifth decretal paragraph of the judgment, modifying the order for care and maintenance of Jane Doe prospectively and directing Dr. Roe, until the further order of the court, to pay to Jane Doe or her committee, or any institu *838 lion in which she may be confined, or to any person in whose legal custody she may be, the sum of $223 per month, covering the cost of her present care and maintenance in the Psychiatric Hospital in the sum of $203 per month, plus pocket money in the sum of $20 per month, and a reasonable counsel fee for the prosecution of this proceeding.
The motion is bitterly opposed by Dr. Roe. He spared no expense in engaging eminent counsel who represent him very well indeed. I was so impressed with his attorney’s oral presentation on the return day of the motion that I indicated from the Bench that I was inclined to go along with his argument that the representatives of the Austrian Consulate General had no standing in court in the first place, and that payments for the care and maintenance of the incompetent could be enforced only while she was institutionalized in New York State; that the obligation to make such payments ceased upon her deportation to a foreign country.
The papers presented by Dr. Roe’s attorney are a far cry from the affidavits of the penurious intern of 30 years ago. The opposing affidavits are wondroufely composed and paint a touching account of the naive young intern who fell easy prey to the machinations of a predatory demented female. Dr. Roe is portrayed as such an exemplary character that one would never guess this is the same man who emerges from the yellowed files deep in the bowels of the County Clerk’s storage room.
To quote from Dr. Roe’s affidavit in the present motion: “ Aside from the fact that all fairness and equity cries out for a denial of this motion, I am advised by my attorneys that it is fortunate, too, that as a matter of law the relief sought herein is without merit and should be denied. ’ ’
No longer does Dr. Roe cry poverty. As a prosperous physician residing in an expensive New York suburb, with prestigious hospital affiliations, he disdains to raise the question of ability to pay. He now relies on equity and the law.
Dr. Roe’s attorney vigorously argues that upon Jane Doe’s deportation to Austria in 1950 his obligation to support her ceased as a matter of law. His reliance on Ambruster v. Ambruster (170 Misc. 387) is hardly compelling. The issues in that case were whether the New York court could exercise jurisdiction to dissolve the marriage of a nonresident incompetent, and to impose the posting of security, neither of which is an issue herein; nor can plaintiff gain any comfort from Bancroft v. Bancroft (288 N. Y. 323). In fact, the adversary attorney cites the same case to bolster his contention that the statute intended *839 that the sane sponse be required to assure the maintenance and care of the insane spouse so that the woman shall not thereafter become a public charge. I have given due consideration to plaintiff husband’s interlineation of the phrase “ to protect the state,” but that phrase is overcome by the language which precedes it.
Section 141 of the Domestic Relations Law provides that in the event of an annulment against the wife upon the ground of incurable insanity: “ the court shall include in the judgment an order directing the husband to provide for her suitable support, care and maintenance during life ’ ’.
The provision for support is mandatory. It makes no difference whether the defendant in such an action is institutionalized or not. In either case there is an absolute duty imposed upon the plaintiff to support her for life (Cohen v. Cohen, 289 N. Y. 145). In fact, the support, to which the defendant whose marriage is annulled because of her insanity is entitled, continues for her life even if the husband should predecease her (Matter of Lichtenstein, 44 Misc 2d 915 and cases cited therein).
Research has failed to disclose any indication that defendant’s absence from the State or country could in any manner impair her right to support. Indeed, such an interpretation of the language of the statute would be totally erroneous. In Spelman v. Spelman (188 Misc. 16, 17-18), Mr. Justice (later Judge) Fboessel stated: “ It is clear from the opinion of the Court of Appeals [in Cohen v. Cohen, supra] that a husband who has obtained a dissolution of his marriage with his wife upon the ground of her incurable insanity, is obligated to support her during her life whether or not she is confined to an institution or is released therefrom upon recovery.”
On the question of the authority of the Austrian Consul General to appear on behalf of the defendant in this action, it is well settled that he has that right. In Matter of Zalewski (292 N. Y. 332, 342-343), the Court of Appeals confirmed this right in according the Polish Consul General under the Polish American Consular Treaty the right: ‘ ‘ to ‘ appear personally ’ in matters concerning claims for nonsupport * * * on behalf of his absent countrymen ”. The court, among other things, quoted with approval from the Harvard Law School “Research in International Law” (p. 278) the following language (pp. 341-342): “Inquiry, preliminary intervention and conservatory measures may not prove sufficient to protect the interest of an absent minor or incompetent national of the sending state. In that case the consul is entitled by this paragraph to represent such national in proceedings before the courts or other author *840 ities of the receiving state, initiating and defending actions and in general doing what the individual himself might do to defend his interests under the local law if he were present and competent.”
The court will take judicial notice of the Treaty of Friendship, Commerce and Consular Rights between the United States and Austria, dated June 19, 1928 and June 20, 1931 (47 U. S. Stat. 1876) which is now in effect and which, in article I thereof, contains the so-called most favored nation clause. As a result thereof, Austrian nationals, under said treaty are entitled to the benefits of any more favorable treaty, including the Polish Treaty referred to in the Zalewski case.
The same result was reached in Matter of Bedo (207 Misc. 35, 36) in which the court, citing Matter of Zalewski (supra) held: ‘ ‘ Our courts have consistently given recognition to the power of a foreign consular officer recognized by our Government to assert or defend the property rights of his nationals irrespective of whether or not he has been accorded the right to represent them in court by provision of treaty or otherwise ”.
To the same effect see Buxhoeveden v. Estonian State Bank (265 App. Div. 966 [2d Dept.]), and the interpretation of the applicable law as it appears in Corpus Juris Secundum (vol. 3, Ambassadors and Consuls, § 15, p. 1027): 1 ‘ Broadly speaking, consuls are clothed with authority to protect the commercial interests of the citizens or subjects of their nation in the country to which they are accredited, and to take appropriate measures for the protection of the property interests of their nationals where they are not present to act for themselves and have no other representative.”
Defendant’s motion is granted to the following extent:
1. Defendant is granted a money judgment against the plaintiff in the sum of $5,160 together with interest as accrued, representing unpaid care and maintenance of the defendant at the rate of $20 per month pursuant to the judgment of annulment from March 1,1950 through August 31,1971 ;
2. Pursuant to the fifth decretal paragraph of the judgment and section 236 of the Domestic Relations Law, modifying the order for the care and maintenance of the defendant prospectively as of the return date of the motion, and directing the plaintiff, until the further order of this court, to pay to the defendant or her committee, or any institution in which she may be a patient, or to any person in whose legal custody she may be, the sum of $203 per month covering the cost of her present care and maintenance in the Psychiatric Hospital of the City of *841 Vienna, and commencing with February 1, 1972 the additional sum of $20 per month for pocket money for defendant; these payments are to continue for Jane Doe’s life. In the event Dr. Roe predeceases her, his estate shall provide for the necessary payments until her death; and
3. Pursuant to section 237 of the Domestic Relations Law, directing plaintiff to pay a counsel fee to defendant in the sum of $2,500, inclusive of disbursements. Defendant’s attorney’s work was made more difficult by the fact that upon the original investigation of the facts necessary for the making of the motion, Dr. Roe denied that he was the Dr. Roe who was the plaintiff in the annulment action, and denied knowing Jane Doe at all.
The counsel fee is payable as follows: $1,250 within 10 days after service upon plaintiff of a copy of the order to be entered hereon, and the balance 30 days thereafter.